1

2

3

4

5                    IN THE UNITED STATES DISTRICT COURT

6                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8  CALIFORNIA SERVICE EMPLOYEES HEALTH &          No. C-06-3078 CW
   WELFARE TRUST FUND; MIKE GARCIA,
9  Trustee; CHARLES GILCHRIST, Trustee;          ORDER GRANTING IN
   RAYMOND C. NANN, Trustee; LARRY T.             PART PLAINTIFFS'
10 SMITH, Trustee; and CALIFORNIA                 MOTION FOR SUMMARY
   SERVICE EMPLOYEES HEALTH & WELFARE             JUDGMENT; GRANTING
11 TRUST FUND derivatively on behalf of           IN PART DEFENDANTS'
   ADVANCE BUILDING MAINTENANCE,                  MOTION FOR SUMMARY
12                                                JUDGMENT; AND
                Plaintiffs,                       GRANTING IN PART
13                                                PLAINTIFFS' MOTION
        v.                                        TO STRIKE
14                                                DEFENDANTS' DEMAND
   ADVANCE BUILDING MAINTENANCE, INC.;            FOR JURY TRIAL
15 XL HOG, INC.; and FORREST I. NOLIN,
   individually,
16

17              Defendants.
   _____/
18

19

20      Plaintiffs California Service Employees Health & Welfare Trust

21 Fund (Trust) and trustees Mike Garcia, Charles Gilchrist, Raymond

22 Nann and Larry Smith move for partial summary judgment on their

23 claims against (1) Defendant Forrest I. Nolin for constructive

24 fraudulent transfers and an illegal disbursement; and (2) Defendant

25 XL Hog, Inc. for the unpaid liability of Advance Building

26 Maintenance, Inc. on the theory that XL Hog is the successor to

27 Advance.  Plaintiffs also move to strike Defendants' jury demand.

28 Defendants oppose both motions and cross-move for summary judgment

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

on the same claims.  The motions were heard on August 26, 2010.
Having considered oral argument and all of the papers filed by the
parties, the Court GRANTS IN PART Plaintiffs' motion for summary
judgment and GRANTS IN PART Defendants' cross motion for summary
judgment.  The Court GRANTS IN PART Plaintiffs' motion to strike
Defendants' jury demand.

BACKGROUND

As discussed in the Court's earlier orders, the Trust is a
non-profit, neutral third party established to administer health
and welfare benefits to members of various unions pursuant to
collective bargaining agreements with employers including Advance.
Nolin was the CEO and sole shareholder of Advance.  This dispute
arises out of successive collective bargaining agreements (CBAs),
also called Maintenance Contractors Agreements (MCAs), between
Advance and members of Local 1877 (previously Local 399) of the
Service Employees International Union (SEIU).  Under the
agreements, Advance was required to make contributions to the Trust
for health and welfare benefits for covered employees.

On May 8, 2006, Plaintiffs filed this complaint against
Advance, alleging various unpaid benefits, late paid benefits and
related claims for interest and liquidated damages due for the time
period January, 1999 through December, 2002 and on two accounts for
the time period August, 2003 through December, 2003.  On October
25, 2006, the Trust sent a letter to Advance's counsel that its
damages totaled $605,582.93.

Two disbursements made in 2007 are at issue in this summary
judgment motion.  Between April and July of 2007, "Nolin caused

2

United States District Court
For the Northern District of California

Advance to repay" $127,000 on a line of credit that he personally guaranteed.  Motion at 3.  In June, 2007, Advance made a $450,000 disbursement to Nolin.  Nolin claims that he received this payment "in exchange for 35 years of good management services."  Nolin Decl. ¶ 5.  Plaintiffs claim that these disbursements were improper because he "took the $577,000 out of the corporation for his personal financial benefit at a time when he knew or should have known that Advance was in a financial crisis."  Motion at 3. Plaintiffs assert that Advance's revenues had been declining over the years previous to the disbursements and, in March, 2007, it lost its largest client, which resulted in a loss of approximately thirty percent of its revenue.

On July 6, 2007, the Trust filed a motion for summary judgment against Advance.  In its opposition, filed on July 20, 2007, Advance objected to only $30,271.42 of the audit findings as erroneous.[1]  On November 1, 2007, the Court granted the Trust's motion in part, finding that Advance was liable for $647,382.02 in delinquent payments, liquidated damages, interest related to those delinquent payments, interest and liquidated damages related to untimely payments, attorneys' fees, costs and accounting fees.  The Court also granted the Trust's request for injunctive relief and entered a preliminary injunction preventing Advance from paying any dividends, bonuses or extraordinary salary to its officers or

---

[1] Advance also opposed Plaintiffs' summary judgment motion by arguing that the affirmative defense of laches barred all of Plaintiffs' claims; however, this argument had no merit.  The Court denied the Trust summary judgment on the issue of whether Advance was entitled to credit for a $1,825.48 overpayment.

3

**United States District Court**
For the Northern District of California

directors until $647,382.02 owed to the Trust was paid in full.

Finally, the Court granted the Trust leave to file an amended complaint alleging four additional causes of action, adding Nolin as a Defendant and adding the Trust derivatively on behalf of Advance as a Plaintiff.  On December 26, 2007, the Court denied Nolin's motion to dismiss the amended complaint.  On January 8, 2008 the Court granted Plaintiffs leave to file a second amended complaint alleging delinquent payments for the time period January, 2003 through July, 2007.

On January 9, 2008, Advance filed an action for voluntary wind-up and dissolution, and an application for an order appointing a receiver.  These filings were made in the Superior Court of California for the County of Los Angeles (Western District) (Case no. SS 016358).

On June 26, 2008, Plaintiffs accepted Advance's offer of judgment in the present case pursuant to Rule 68 of the Federal Rules of Civil Procedure in the sum of $955,760.56, plus attorneys' fees.

On October 6, 2008, the receiver filed a motion in the state court receivership proceeding for permission to close the operations of Advance.  Although potential buyers were interested in purchasing Advance, the receiver was unable to sell the business.  One written offer was made but the interested buyer could not obtain financing.  The receiver reported that other potential buyers lost interest because Advance's management did not provide accurate and timely information they requested and would not commit to non-competition and transitional consulting

4

arrangements.

On October 31, 2008, during a status conference and hearing on the receiver's request to close Advance, the receiver notified the state court and the Trust of an intended sale of Advance's assets to Nolin or an entity formed by him, for $300,000.  The contract of sale stated that the assets would be sold free and clear of any liability to the Trust.

After briefing and oral argument on the sale, and over the Trust's objections, the state court approved the sale to Nolin "or his nominee ('Buyer'), it being contemplated that Nolin will form a new entity prior to Closing which shall become the Buyer hereunder."  Before the sale closed, Nolin formed XL Hog, which became the buyer.[2]  The Trust then filed a third amended complaint (TAC), adding XL Hog as a defendant and claims against it for successor liability.

LEGAL STANDARDS

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true

---

[2]The Court takes judicial notice of the documents from the state court action.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

the opposing party's evidence, if supported by affidavits or other evidentiary material. <u>Celotex</u>, 477 U.S. at 324; <u>Eisenberg</u>, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

DISCUSSION

I.   Constructive Fraudulent Transfers

Both parties move for summary judgment on the claims that Advance made constructive fraudulent transfers to Nolin. As noted above, the transfers at issue are a $450,000 disbursement made to Nolin in June, 2007 and a $127,000 repayment on a line of credit which Nolin had personally guaranteed.

A.   Reasonable Equivalent Value

California Civil Code section 3439.04(a) defines a constructive fraudulent transfer as follows:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
>
> . . .
>
> (2) Without receiving a reasonably equivalent value in

6

exchange for the transfer or obligation, and the debtor either:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

(B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

The party alleging a constructive fraudulent transfer bears the initial burden to show that the transferor did not receive reasonably equivalent value. <u>Whitehouse v. Six Corp.</u>, 40 Cal. App. 4th 527, 534 (1995). "Unlike contract law, which requires only that 'adequate' consideration be given, UFTA [Uniform Fraudulent Transfer Act] requires that, to escape avoidance, a transfer have been made for 'reasonably equivalent value.' The purpose is not to identify binding agreements, but to identify transfers made with no rational purpose except to avoid creditors." <u>Donell v. Kowell</u>, 533 F.3d 762, 777 (9th Cir. 2008). Moreover, the issue of "reasonably equivalent value" is determined from the perspective of the transferor's creditors and the court must analyze all the circumstances surrounding the transfer. <u>Maddox v. Robinson</u> (<u>In re Projean</u>), 994 F.2d 706, 708 (9th Cir. 1993); <u>Greenspan v. Orrick, Herrington & Sutcliffe LLP</u>, (<u>In re Brobeck, Phleger & Harrison, LLP</u>), 408 B.R. 318, 341-42 (Bankr. N.D. Cal. 2009).

1.   $127,000 Line of Credit

Plaintiffs argue that "there is no evidence of reasonably equivalent consideration <u>from Nolin</u> in the record for the repayment of $127,000 on the line of credit guaranteed by Nolin." Motion at

7

United States District Court
For the Northern District of California

8 (emphasis added).  However, Nolin merely guaranteed the line of credit; he did not pay himself $127,000 nor was he responsible to provide a reasonably equivalent value to the company.  Further, Plaintiffs do not dispute that the $127,000 payment to the bank was for the reasonable equivalent value of a $127,000 draw-down on the line of credit.  Because Advance received a reasonably equivalent value for the $127,000 payment, Plaintiffs' constructive fraudulent transfer claim based on this payment fails as a matter of law.

## 2.   $450,000 Disbursement

Plaintiffs' forensic accountant expert Randy Sugarman concluded that "Advance received no foreseeable equivalent value or any demonstrated value for the payment of the $450,000 dividend to Nolin in June 2007 since it was the distribution of part of the assets of Advance not in exchange for any services or property."  Sugarman Decl., Ex. A at 6.  As noted above, Nolin claims that Advance gave him the $450,000 "in exchange for 35 years of good management services."  Nolin Decl. ¶ 5.  He states, "In the more than 35 years that I helped run the company, I developed Advance from a fledgling company to a major competitor in the Los Angeles building services market."  Id.

Defendants' certified public accountant expert, Kip Jones, claims that "it was not improper for Nolin to issue the $450,000 distribution to himself in June 2007 because at the time, Advance was adequately capitalized, met the requirements for a distribution under California Corporations Code section 500, and Nolin had provided long term valuable services as founder and CEO."  Jones Decl. ¶ 4(a) (emphasis in original).  However, Jones' opinion does

8

not address whether the $450,000 was given in exchange for reasonably equivalent value. Jones was opining as to the solvency of Advance at the time it made the distribution to Nolin and whether, considering the company's capital, it was "improper" in some undefined sense to make the distribution. Therefore, Jones' statement does not support Defendants' position on this issue.

Both parties rely on In re Richmond Produce, 151 B.R. 1012 (Bankr. N.D. Cal. 1993). In Richmond Produce, the court considered the manager's argument that his "managerial skills to the Debtor" constituted value in return for a $1.5 million transfer. The court stated, "This argument ignores the fact that [the manager] was paid $20,000 per month for these services. Given the rapid demise of the Debtor . . . it is difficult to argue that the value of his services exceeded this amount." Id. at 1018. The court also noted that "treating such ephemeral benefits as value seems inconsistent with the approach taken in other bankruptcy contexts." Id. (citing Norwest Bank Worthington v. Ahlers, 485 U.S. 197 (1988)).

Defendants try to distinguish Richmond Produce by asserting that Nolin was paid for past services, "which is a recognized, proper basis for an extraordinary payment." Opp. at 5. However, the case on which Defendants rely, Mayors v. Comm. of Internal Rev., 785 F.2d 757, 761 (9th Cir. 1986), does not directly address this issue, and Richmond Produce does not distinguish between past and present services. Further, Nolin had received a regular salary and bonuses for his services over the years, including a $200,000 bonus in December, 2006. Miller Supp. Decl. ¶ 3; Ex. C-2, Chung

9

United States District Court
For the Northern District of California

Dep. 50:23-51:4.  It is difficult to conceive of how an additional $450,000 payment to Nolin six months later benefitted Advance. This is especially true considering that, three months earlier, in March, 2007, Advance lost its largest client and along with it thirty percent of its revenue.  Two months before the bonus, in April, 2007, Advance's legal counsel recognized the financial challenges facing the company, stating:

> Advance is in trouble.  During the last month alone, Advance lost 15 buildings (th Ardent Contract), representing 2,580,833 cleanable square feet.  The monthly billings for these buildings, including the night crew and day porters totalled $284,274.  The yearly total is $3,411,288.  A breakdown of the buildings and monthly billings is enclosed with this letter.  For a small business like Advance, this is catastrophic.
>
> Advance is now fighting for its survival.

Miller Decl. ¶ 10, Ex. E.[3]  The president of Advance, Perla Moszienicki, confirmed that, in April, 2007, the company was "fighting for its survival" and was "suffering from severe financial difficulties."  Miller Decl., Ex. B, Moszienicki Dep. at 177:5-14.  Advance's independent accountant, Steven Vallen,

---

[3]Defendants argue that this statement is inadmissible because it was part of settlement communications, which are inadmissible to prove liability. Fed. R. Evid. 408.  However, this statement was not "made in compromise negotiations regarding the claim" at issue nor was it an example of "furnishing or offering or promising to furnish -- or accepting or offering or promising to accept -- a valuable consideration in compromising or attempting to compromise the claim." Id.  The statement is not offered as evidence of Defendants' liability.  Rather, it is used to show Defendants' knowledge of Advance's financial circumstances two months before the $450,000 transfer.  See Cohn v. Petsmart, 281 F.3d 837, 840 (9th Cir. 2002) (settlement statement used to show a party's assessment of a claim); Green v. Baca, 226 F.R.D. 624, 642 (C.D. Cal. 2005) (settlement statement used to show evidence of notice). Thus, admitting the statement does not implicate the purpose of the rule -- to encourage settlements.

concurred and noted that, at the time, Advance was among the "walking dead." Miller Decl., Ex. F, Vallen Dep. at 61:23-24. In sum, Plaintiffs have proven the Nolin did not give Advance reasonably equivalent value for the $450,000 distribution.

Once the burden to show that the transferor did not receive reasonably equivalent value is met, a transfer is presumptively fraudulent and the burden shifts. Whitehouse, 40 Cal. App. 4th at 534; In re Pajaro Dunes Rental Agency, Inc., 174 B.R. 557, 589-90 (Bankr. N.D. Cal. 1994). The transferee must show that (1) the debtor's remaining assets were not unreasonably small in relation to the business in which it was engaged and (2) the debtor should not have reasonably believed that it would incur debts beyond its ability to pay as they became due. Cal. Civ. Code § 3439.04(a)(2); In re Pajaro Dunes, 174 B.R. at 590.

B.   Debtor's Remaining Assets

The determination of whether a transferor retained unreasonably small assets following a challenged transfer is based on the information available at the time of the transfer. See Intervest Mortg. Inv. Co. v. Skidmore, 655 F. Supp. 2d 1100, 1104 (E.D. Cal. 2009). The inquiry does not require proof of insolvency. Reddy v. Gonzalez, 8 Cal. App. 4th 118, 123 (1992). Assets are unreasonably small if they are "not reasonably likely to meet the debtor's present and future needs." Intervest, 655 F. Supp. 2d at 1106.

Plaintiffs' expert, Sugarman, reviewed Advance's financial records and found that it had a decline in revenue from $15.9 million in 2002 to $11.2 million in 2006. As noted above, after

11

Advance lost its biggest client in March, 2007, its revenues
dropped by about thirty percent.  Between April, 2007 and June,
2007, Advance "was incurring losses of approximately $60,000 a
month."  Sugarman Decl., Ex. A at 5.  According to Sugarman, after
Nolan's distribution in June, 2007, Advance's cash balance declined
to approximately $635,000 on June 30, 2007.  Sugarman stated,

> Nolin's taking of the $450,000 dividend meant that Advance
> could not continue to fund its operating losses while it
> reduced its operating costs and/or found replacement
> business and pay all of its debts as they became due
> including the debt to the Trust.

> If at the end of June 2007 after the $450,000 dividend, had
> Advance paid the liability to the Trust of $606,000 not
> including amounts known or foreseeable for the subsequent
> four years of contributions, Advance would have had only
> approximately $28,000 of cash. . . .  This would not have
> been enough cash to fund its known projected operating
> losses for the month of July.

Sugarman Decl. Ex. A at 8.

Defendants' experts concluded otherwise.  Finance expert
Robert Wunderlich concluded that, as of May 31, 2007, just before
the $127,000 payment on the line of credit and $450,000
disbursement, Advance had $1.6 million in cash and $632,302 in
accounts receivable.  Wunderlich Decl., Ex. A at 7.  He continued:

> On or about June 14, 2007, ABM [Advance] distributed
> $450,000 to Forrest Nolin.  After the transfer, as of June
> 30,2007, ABM had cash of approximately $850,000 and accounts
> receivable of approximately $890,000.  After the transfer to
> Mr. Nolin, ABM had total current assets of approximately
> $1.98 million, compared with current liabilities (not
> including obligations to the Trust) totaling approximately
> $150,000).

Id.  Wunderlich then analyzed Advance's working capital in June,
2007.  Working capital is the ratio between current assets and
current liabilities.  Id.  Advance had a ratio of 12.9.  Wunderlich

12

claims that this "reflects a high amount of available current assets at the time." Id.

Plaintiffs challenge these figures, arguing that Wunderlich inappropriately included accounts receivable as assets in his analysis. Plaintiffs' argument is well-taken. Accounts receivable are not cash on hand; they are cash expected to be received in the future. As receivables are paid by clients, new receivables are simultaneously created by ongoing operations. Thus, the balance of receivables, which is unavailable to use to pay bills, remains substantial.

Without considering accounts receivable, as of June 30, 2007, Advance "had cash of approximately $850,000." Opp. at 7. In October, 2006, Advance received a thorough explanation of its unpaid contributions to the Trust and its debt of approximately $606,000. On July 6, 2007, the Trust filed its motion for summary judgment. The Court granted the Trust's motion in part and awarded the trust $647,328.08. Advance had not changed its accounting practices after the initial audit, which meant that it was on notice that it faced similar liability for the period between 2003 and June, 2007. Advance later made an offer of judgment for this second period of liability in the sum of $346,344.64, for the contributions, interest and liquidated damages, which were past due in June, 2007. In total, in June, 2007, Advance had past due debt to the Trust exceeding $900,000.

Further, after losing its biggest client in April, 2007, Advance was consistently operating at a loss: April -- $43,754; May -- $60,394; June -- $39,541; July -- $54,022; August -- $65,955;

13

September -- $35,569; October -- $31,872; November -- $62,198. Wunderlich Decl., Ex. D-1.

In January, 2008, less than seven months after Nolin received the $450,000 distribution, Advance sought judicial relief in a state court receivership. As part of its petition, Nolin declared:

> At the present time, it is unclear to me whether Advance has the ability to pay its obligations to creditors as they mature; . . . [and] whether the assets of Advance exceed its liabilities or whether liabilities exceed the assets.

Miller Decl., Ex. G. In sum, the Court finds that, in June, 2007, Advance was doomed by the $450,000 payment to Nolin. No reasonable trier of fact could find that the $850,000 that Advance had in cash after the $450,000 transfer to Nolin was reasonably adequate to conduct its business.[4]

C.    Incur Debts Beyond Ability to Repay

Nolin has not created a triable issue of fact to dispute that he should have reasonably known that, after the $450,000 payment, Advance would incur debts beyond its ability to pay as they became due. Cal. Civ. Code § 3439.04(a)(2)(B). This test likewise does not require proof of insolvency. Reddy, 8 Cal. App. 4th at 123.

As noted above, in April, 2007, two months before the $450,000 transfer, Nolin's attorney stated that "Advance is in trouble." After describing the impact from losing its largest contract as

---

[4]Defendants argue that Advance had a one million dollar line of credit that it could have utilized to pay down any debts. However, to draw down on this line of credit, Nolin would have had to agree to expose himself to additional personal liability. Defendants do not present any evidence to suggest that Nolin was willing to do this. In fact, the evidence suggests the opposite. Between April and July of 2007, Advance paid down its line from credit from $174,475 to $46,001.

United States District Court
For the Northern District of California

"catastrophic," he noted, "Advance is fighting for its survival. In light of this reality, Advance faces a choice, either pay my fees to defend this lawsuit or pay to settle the lawsuit. Advance cannot do both." In April, 2007, Nolin knew of Advance's inability to pay timely the Trust and its other debts, including those to its attorneys. As CEO, owner, and someone who reviewed Advance's monthly financial statements regularly, Nolin reasonably should have known about the liabilities to the Trust, the losses of income from operations and the cash shortfall discussed above. Further, because Advance had not changed its reporting practices after the initial audit, Nolin was on notice that Advance had an additional liability to the Trust for the period after 2002 on top of the $606,000 claim through 2002. As a matter of law, Nolin cannot meet his burden to show that, after the $450,000 transfer, Advance would be able to pay the past due debt to the Trust and its other obligations as they became due.

D.   Remedies for Nolin's Constructive Fraudulent Transfer

California Civil Code section 3439.07 provides:

(a) In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in Section 3439.08, may obtain:

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim.

(2) An attachment or other provisional remedy against the asset transferred or its proceeds in accordance with the procedures described in Title 6.5 (commencing with Section 481.010) of Part 2 of the Code of Civil Procedure.

(3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure, the following:

15

(A) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or its proceeds.

(B) Appointment of a receiver to take charge of the asset transferred or its proceeds.

(C) Any other relief the circumstances may require.

(b) If a creditor has commenced an action on a claim against the debtor, the creditor may attach the asset transferred or its proceeds if the remedy of attachment is available in the action under applicable law and the property is subject to attachment in the hands of the transferee under applicable law.

(c) If a creditor has obtained a judgment on a claim against the debtor, the creditor may levy execution on the asset transferred or its proceeds.

Section 3439.08 states that to the extent that a transfer is voidable:

(b) the creditor may recover judgment for the value of the asset transferred, as adjusted under subdivision (c), or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against the following:

(1) The first transferee of the asset or the person for whose benefit the transfer was made.

. . .

(c) If the judgment under subdivision (b) is based upon the value of the asset transferred, the judgment shall be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require.

Defendants claim that the above statutory scheme does not provide for a direct monetary judgment against Nolin in favor of the Trust. However, the statutory language of sections 3439.07 and 3439.08 does not preclude this type of remedy. In fact, section 3439.07(a)(3)(C) grants courts great discretion in fashioning "any other relief the circumstances may require." Here, the Trust pursues the constructive fraudulent transfer claim on its own

16

United States District Court

For the Northern District of California

behalf as a creditor of the transferor, and it may be remedied by a direct judgment in its favor against the transferee.[5]  See Filip v. Bucurenciu, 129 Cal. App. 825, 839-40 (2005) (money judgment against transferees proper under Section 3439.07(a)(3)(C)); United States v. Lansing, 272 F. Supp. 170, 174-75 (N.D. Cal. 1967) (transferees directly liable to creditor for violation of predecessor of Section 3439.04).  Judgment against Nolin in favor of the Trust will be entered for purposes of section 3439.08(b) because he is "the person for whose benefit the transfer was made."

To ensure that the proceeds of the transfer are available to satisfy the judgment, the Court enjoins Defendants from withdrawing any funds from Morgan Stanley account no. 255-042420-202 that would cause the balance to drop below $2 million.  See § 3439.07(a)(3)(A). Further, the Court enjoins Defendants from transferring money to, or for the benefit of, Forest I. Nolin other than a prospective monthly salary of up to $12,000.  Payments for Nolin's salary may be made to compensate his work from August 1, 2010 henceforth, not to compensate his prior work.

Plaintiffs also seek attorneys' fees for Defendants' constructive fraudulent transfer.  Plaintiffs first argue that attorneys' fees can be awarded under ERISA section 502(g)(2)(D) in a pendent action for fraudulent conveyance arising out of an ERISA collection action.  Plaintiffs rely on Local 445 Welfare Fund v. Wein, 855 F.2d 62 (2d Cir. 1988), which held that ERISA section

---

[5]Defendants reliance on Hassen v. Jonas, 373 F.2d 880, 881-81 (9th Cir. 1967), is misplaced.  A creditor's right to obtain a direct judgment was not at issue in that case.

502(g)(2)(D) authorized attorneys' fees for a pendent fraudulent conveyance action because the claim was necessary to enforce the duty to make benefit contributions under ERISA section 515. However, the plain language of section 502(g)(2)(D) does not authorize attorneys' fees under the state law claims here.  That section provides, "In any action under this subchapter . . . the court shall award the plan reasonable attorney's fees and costs." Id. (emphasis added).  Moreover, Wein was decided over twenty-two years ago and no other circuits have adopted its reading of section 502(g)(2)(D).  Therefore, Plaintiffs are not entitled to attorneys' fees under this section for the constructive fraudulent transfer claim.

Plaintiffs also seek attorneys' fees under California Code of Civil Procedure section 1033.5(a)(10), which permits recovery of attorneys' fees when authorized by contract, statute or law. However, Plaintiffs have not pointed to any contract, statute, law or case that supports an award of attorneys' fees for a violation of California Civil Code section 3439.07.

II.  California Corporation Code Section 501

The parties also move for summary judgment on Plaintiffs' claim that Defendants violated California Corporations Code section 501.  This section prohibits a corporation from making

> any distribution to the corporation's shareholders if the corporation or the subsidiary making the distribution to the corporation's shareholders . . . is, or as a result thereof would be, likely to be unable to meet its liabilities (except those whose payment is otherwise adequately provided for) as they mature.

Defendants argue that Advance did not violate section 501

18

because, under section 500, it was adequately "capitalized" before and after it made the $450,000 distribution to Nolin.  They rely on California Corporations Code section 500(b), which prescribes the amount of capital a corporation must have before making a distribution:

> (b) The distribution may be made if immediately after giving effect thereto:
>
>> (1) The sum of the assets of the corporation (exclusive of goodwill, capitalized research and development expenses and deferred charges) would be at least equal to 1 1/4 times its liabilities (not including deferred taxes, deferred income and other deferred credits); and
>>
>> (2) The current assets of the corporation would be at least equal to its current liabilities . . . .

Defendants' reliance on section 500 is misplaced because Plaintiffs bring a claim under section 501, not 500.  These two sections proscribe different conduct and the California Legislature specifically contemplated that violations could be brought under either section.  See Cal. Corp. § 506(b) ("Suit may be brought . . . for a violation of Section 500 or 501 against any or all shareholders . . . .").  Section 501 clearly proscribes distributions which would render the corporation "likely to be unable to meet its liabilities."  Plaintiffs claim that, after Advance paid Nolin the $450,000 distribution, it was "likely to be unable to meet its liabilities."  Relying on the same evidence to show that Advance should have known that it would not be able to pay the Trust and its other debts when they became due, see Cal. Civ. Code § 3439.04(a)(2), Plaintiffs have demonstrated that, after Advance paid Nolin the $450,000 distribution, it was "likely to be unable to meet its liabilities."  Therefore, the Court concludes

that the distribution violated section 501 of the California Corporations Code.  Once an illegal distribution under this section is found, the shareholder recipient "is liable to the Corporation for the benefit of all creditors" for the amount received "with interest at the legal rate on judgments until paid" but not exceeding the amount of injury.  Cal. Corp. Code § 506(a).

III. ERISA Claim

ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes civil actions by participants or beneficiaries "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

Plaintiffs assert that the $450,000 distribution to Nolin was made to "avoid responsibility for violations of Section 515."[6] Motion at 18.  Rather than make benefit contributions as required under section 515, Defendants made an illegal distribution to Nolin.  Therefore, the Court grants Plaintiffs summary judgment on their section 502(a)(3) claim because it was brought "to enforce" section 515 and the Trust Agreement.[7]

Under section 502(g)(1), the Trust is entitled to a

---

[6]Section 515 states, "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."  29 U.S.C. § 1145.

[7]Under section 503(a)(3), Plaintiffs are entitled to the same equitable relief the Court awards in relation to the constructive fraudulent transfer claim.

20

discretionary award of attorneys' fees.  That statute provides, "In any action under this title . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  At this juncture, the Court will not determine whether to exercise its discretion and award Plaintiffs' attorneys' fees under section 502(g)(1).  Plaintiffs may address this issue again after judgment has been entered on the entire case.

IV.  Successor Liability

Liability of an employer for the obligations of its predecessor attaches "when (1) the subsequent employer was a bona fide successor and (2) the subsequent employer had notice of the potential liability."  <u>Steinbech v. Hubbard</u>, 51 F.3d 843, 846 (9th Cir. 2004).  At issue in the present case is whether XL Hog was a bona fide successor to Advance.  "Whether an employer qualifies as a bona fide successor will hinge principally on the degree of business continuity between the successor and predecessor."  <u>Id.</u>

Defendants argue that XL Hog is not Advance's successor because of language in the state court order which approved of the sale of Advance's assets to XL Hog.  The order stated:

> ORDERED that the Receiver is authorized to sell certain assets of [Advance] pursuant to the terms of the Agreement attached to the Motion; and it is further
>
> ORDERED that the sale of assets as described above shall include the assumption of certain liabilities by the Buyer as set forth in the Agreement attached to the Motion; and it is further
>
> ORDERED that the Receiver is authorized to take any and all steps necessary and appropriate to consummate the transaction described in the Agreement.

United States District Court
For the Northern District of California

21

**United States District Court**
For the Northern District of California

The "Agreement" attached to the motion stated that the assets would be sold free and clear of any liability to the Trust. Specifically, the Agreement provided,

> Neither Nolin nor Buyer shall assume nor shall either of them be responsible for payment of any of the following:
>
> (a) professional fees owing to the Receiver and his attorneys and agent, including Ballenger Cleveland & Issa, LLC;
>
> (b) obligations of [Advance] to the California Service Employees Health & Welfare Trust Fund arising before the appointment of the Receiver (even though such obligations may have been awarded or fixed after appointment of the Receiver), including any and all amounts included in [Advance's] Rule 68 offer of judgment or otherwise awarded by the United States District Court of the Northern District of California in case no. C 06-03078 CW, <u>California Service Employees Health & Welfare Trust Fund, et al. v. Advance Building Maintenance and Forest I. Nolin</u>;
>
> (c) any other obligations of [Advance] existing prior to the appointment of the Receiver.

As noted above, before the sale closed, Nolin formed XL Hog, which became the buyer.

Earlier in this litigation, Defendants moved to dismiss the successor liability claim based on res judicata, collateral estoppel and the <u>Rooker-Feldman</u> doctrine. For the same reasons mentioned in that order, the Court again concludes that none of these theories bars Plaintiffs' successor liability claim. As noted in more detail in the earlier order, the state case concerned starkly different issues than those present in the current case, and the issue of successor liability was not explicitly addressed by the state court.

Defendants do not deny that Advance and XL Hog differ in name only. They have the same address, management employees, staff, equipment, services and clients. Miller Decl. ¶ 4, Ex. A at 229:6-

United States District Court
For the Northern District of California

248:22.   As the CEO of Advance and the CEO of purchaser XL Hog, Nolin knew about the claims of the Trust in this litigation.  Based on these facts, the Court concludes that there is a high degree of business continuity between the successor (XL Hog) and the predecessor (Advance).   Therefore, the Court grants Plaintiffs' motion for summary judgment on the successor liability claim.  The Court finds that XL Hog is Advance's successor, liable for its unpaid liability to the Trust.   See Golden State Bottling v. NLRB, 414 U.S. 168 (1973); Hawaii Carpenters Trust Funds v. Waiola Carpenter Shop, 823 F.2d 289, 293 (9th Cir. 1987); Upholsterers' International Union Pension Fund v. Artistic Furniture of Pontiac, 920 F.2d 1323 (7th Cir. 1990); Maccora v. Malone, 1996 U.S. Dist. LEXIS 22738 (N.D. Cal.).

V.   Motion to Strike Jury Demands

Plaintiffs move to strike Defendant XL Hog's demand for a trial by jury on the grounds that Advance waived its right to jury trial by failing to file the demand timely as required by Federal Rule of Civil Procedure 38(b).   Under this rule, a demand for a jury must be made "no later than 14 days after the last pleading directed to the issue is served."   The term "pleading" is defined in Rule 7(a) to refer to various forms of a complaint or an answer.

Plaintiffs argue that XL Hog should have filed its jury demand within fourteen days of the Court's July 20, 2009 Denial of XL Hog's Motion to Dismiss.   At the time Plaintiffs filed their motion to strike, XL Hog had not answered Plaintiffs' complaint or filed a demand for a jury trial.   However, on August 3, 2010, three days before Defendants filed their opposition to this motion, XL Hog

23

United States District Court
For the Northern District of California

filed its answer and demand for a jury trial.  Although the answer
is late, it is nonetheless "the last pleading directed to the
issue[s]" to be decided by a jury.  Because XL Hog's jury demand
was filed on the same day as the answer, the demand was timely.[8]

Plaintiffs also move to strike XL Hog's demand for a jury
trial on the fifth cause of action in the third amended complaint
-- the claim for successor liability.  Under Federal Rule of Civil
Procedure 39(a)(2), the Court may strike a jury demand where it
finds that there is no federal right to a jury trial on the issues.
The Seventh Amendment provides, "In Suits at common law, where the
value in controversy shall exceed twenty dollars, the right of
trial by jury shall be preserved . . . ."  U.S. Const. amend. VII.
The preservation of the right to jury trial "is not limited to
actions that actually existed at common law, but extends to actions
analogous thereto."  Spinelli v. Gaughan, 12 F.3d 853, 855 (9th
Cir. 1993) (citing Tull v. United States, 481 U.S. 412, 417
(1987)).  To determine whether a right to jury trial on a cause of
action exists, a court looks to: (1) "the nature of the right" and
(2) whether the remedies provided "are legal or equitable in
nature."  Spinelli, 12 F.3d at 855-56.  The second prong of this
test is the more important of the two.  Id. at 855.

XL Hog argues that it is entitled to a jury trial because
Plaintiffs ultimately seek a remedy of a money judgment against it

---

[8]Plaintiffs also argue that Advance waived its right to jury
trial by failing timely to file and serve its jury demand.
However, Plaintiffs have already accepted Advance's offer of
judgment pursuant to Federal Rule of Civil Procedure 68.
Therefore, there will be no need for any claims brought against
Advance to be tried to a jury.

United States District Court
For the Northern District of California

and money damages is a legal remedy.  However, successor liability is an equitable remedy, not a legal remedy.  Ed Peters Jewelry Co. v. C & J Jewelry Co., 124 F.3d 252, 267 (1st Cir. 1997) (Ed Peters I) ("successor liability is an equitable doctrine, both in origin and nature.").  In Ed Peters II, the First Circuit noted that the case did "not involve the computation of damages, which is often considered a determination to be made by a jury," but was an action to recover on a debt already reduced to a judgment.  Ed Peters II, 215 F.3d 182, 186 (1st Cir. 2000).  Similarly, here, the Court does not have to determine the amount of the money judgment to be entered because an offer of judgment has been accepted.  Therefore, because successor liability is an equitable remedy and no determination of the judgment amount against XL Hog as a successor is necessary, XL Hog does not have a right to a jury trial on this claim.

Lastly, Plaintiffs argue that Nolin is not entitled to a jury trial on their seventh cause of action, which is a claim under ERISA section 502(a)(3).  Plaintiffs' claim arises out of Defendants' violation of their duty to make required benefit contributions pursuant to ERISA section 515.  Instead of abiding by section 515, Defendants fraudulently transferred assets.  In this cause of action, Plaintiffs do not seek a money judgment against Nolin, but rather the return to Advance or its successor entity by way of a constructive trust of the money fraudulently conveyed to Nolin.  Therefore, the Court may adjudicate this claim without infringing on Nolin's right to a jury trial.

CONCLUSION

For the foregoing reasons, the Court grants in part
Plaintiffs' motion for summary judgment and grants in part
Defendants' motion for summary judgment.  Docket No. 490.
Specifically, the Court grants Defendants' motion and denies
Plaintiffs' motion for partial summary judgment on Plaintiffs'
claim that Advance did not receive a reasonable equivalent on the
$127,000 repaid to the bank for the line of credit.  The Court
grants Plaintiffs' motion and denies Defendants' motion for partial
summary judgment on Plaintiffs' claim that the $450,000
disbursement made to Nolin was a constructive fraudulent transfer.
The Court grants Plaintiffs' motion for summary judgment on their
successor liability claim.

The Court also grants in part Plaintiffs' motion to strike
Defendants' demand for jury trial.  Docket No. 500.  Although XL
Hog filed a timely jury demand, it is not entitled to a jury on the
fifth cause of action for successor liability and Nolin is not
entitled to a jury trial on seventh cause of action for a violation
of ERISA section 502(a)(3).

IT IS SO ORDERED.

Dated: 09/01/10

_____
CLAUDIA WILKEN
United States District Judge

26